IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.                                                    CRIMINAL 03-0055 (JAG)

[1] CARLOS L. AYALA-LÓPEZ
[10] EUSEBIO O. LLANOS CRESPO,

Defendants

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Docket No. 585; opposition Docket No. 679[1]; supplement to
motion, Docket No. 806) (Arrest of March 31, 2002)

This matter is before the court on motion to suppress evidence filed by the defendant Carlos L. Ayala-López on July 21, 2005. (Docket No. 585.) The United States opposed the motion on October 6, 2005 (Docket No. 679), and the defendant supplemented the motion on January 16, 2006. (Docket No. 806.) The defense moved for suppression based upon the argument that a warrantless search of his person was unreasonable, the result of an arrest made without probable cause or reasonable suspicion. He also argues the stop, detention, search and arrest could not be justified as a Terry stop. In his supplemental motion to suppress, the defendant notes that during the evidentiary hearing held on January 13, 2006, it was learned that the same physical evidence subject of the seizure involved in the March 31, 2002 arrest was suppressed in the local court, and that the case was

---

[1] The United States treated the motion in limine related to this seizure (Docket No. 582) as a motion to suppress. (Docket No. 585.)

CRIMINAL 03-0055 (JAG)                    2

subsequently dismissed. Thus, defendant Ayala-López seeks to suppress the evidence on the grounds that it was obtained in violation of the Fourth Amendment guarantee against unreasonable searches and seizures, as well as on double jeopardy grounds.

## I. FACTUAL BACKGROUND

Co-defendant Ayala-López argues in his motion of July 21, 2005 (Docket No. 585) that the stop, search, detention, and arrest of March 31, 2002 were all illegal, conducted without reasonable suspicion or probable cause, and violated the Fourth Amendment. He also argues that the arresting officers had neither a valid arrest nor search warrant to support their actions. As a consequence, he argues that all incriminating items seized from him, especially the .357 caliber Ruger revolver, be suppressed. He places emphasis on the fact that a local judge failed to make a determination of probable cause, suppressed the physical evidence and ultimately dismissed the charges stemming from the March 31, 2002 seizure.

In opposition to the motion to suppress the .357 Ruger, the United States proffers that during the late evening hours of March 31, 2002, officer Martín F. Soto Martínez was conducting a preventive patrol with officer Josué Rodríguez Pérez, within the Luis Lloréns Torres Public Housing Project, and that as the officers drove past Building 25, officer Soto saw an individual standing in the vicinity of the building carrying a handgun in his waistband. The officer exited his vehicle and the individual, later identified as defendant Ayala-López, immediately started running away from the officer. The officer caught up to the defendant and detained him after

CRIMINAL 03-0055 (JAG)                    3

a struggle which caused the handgun to fall to the ground.  The officer recovered the weapon, placed handcuffs on the defendant and took him away from the area.  Upon learning that the defendant did not have a license to possess or carry firearms, the officer placed the defendant under arrest.

At the first hearing on the motion held on January 13, 2006, Police of Puerto Rico Officer Martín Soto testified and stated that he currently works in FURA/SWAT. He began working for the Police of Puerto Rico in 1994.  Before SWAT, he was assigned to the Tactical Operations Division in San Juan where he worked for six years.  He was later assigned to the Division in Caguas and from 1995 to 1998 in San Juan, later to the unit in Caguas, and later returned to the division in San Juan where he was working as an agent in 2002.  His duties were in preventive patrolling and anti-riot.

On March 31, 2002, officer Soto and his partner were working the 6:00 p.m. to 2:00 a.m. shift and were patrolling in a patrol car, with officer Soto in the passenger seat. Officer Soto had the same shift the night before. Specifically, his hours were from 6:00 p.m. of March 31, 2002, to 2:00 a.m. of April 1, 2002. He was patrolling Barrio Obrero which includes a fringe of the Luis Lloréns Torres Public Housing Project.

At about 11:00 p.m., officer Soto and his partner were in the sector of building 25 of the Luis Lloréns Torres Public Housing Project, next to Baldorioty de Castro Avenue, and while proceeding down a two-lane wide road or street (perpendicular

CRIMINAL 03-0055 (JAG)                    4

to Baldorioty de Castro Avenue), officer Soto saw Carlos L. Ayala-López, sitting in a folding chair, alone, on a lawn area, with a rubber-gripped, nickel plated gun in his waistband. When the officer saw the defendant, the officer was getting near building 25 but was not at the building, and was about 30 or 40 feet from him. The defendant was a bit separate from the wall and in front of building, about 50 or 60 feet out from the wall of the building. The defendant was sitting with his front toward the two-lane road, which is wide because the parking area becomes part of the road. The defendant, a stocky individual, may have been wearing light jeans and a tucked-in shirt. The gun was in the front, middle part of the waist band, and the officer saw part of the cylinder and the grips, that is, from the cylinder back. His vision was not obstructed by any tree in front of building 25. The building was completely lit. It was light because of lighting in the front of the building as well as street lights. There was also lighting in the entrance itself. The other building had light and a street light was also located in the area from which the police car approached.

  Co-defendant Ayala-López took off running. Officer Soto gave him a voice command, that he was a policeman, and to raise his hands. Chased by the officer, the defendant kept running and ran as though he was going into building 25. The officer caught up with the defendant near the entrance way to building 25, and grabbed his hands. Both fell on the ground, becoming entangled as in a wrestling match. Officer Soto's partner was next to officer Soto when officer Soto performed

CRIMINAL 03-0055 (JAG)                    5

the arrest. Officer Soto yelled to his partner that the defendant was armed. Officer Soto's weapon was holstered when he jumped on the defendant. The defendant was very aggressive and did not allow himself to be arrested. The defendant hit himself when they both fell. After they fell, the weapon was practically under the defendant when they fell on the ground, still in his waistband. The officer was then able to control the defendant. To restrain the defendant, officer Soto twisted the defendant's arm to his back. Officer Soto then put handcuffs on the defendant while he was on the ground. Officer Soto controlled the defendant's arms twisting his arm behind his back, and causing pain. The defendant then gave the officer the other hand and then the officer took the gun after he put pressure on the defendant. The weapon was under the defendant. Officer Soto then secured the weapon.[2] With the help of his partner, the weapon was checked and it was loaded. Officer Soto placed the defendant under arrest and frisked him because the area was becoming very hostile. Officer Soto denied that his partner sat on the defendant at the arrest scene.[3] Perhaps 10 to 30 people arrived at the scene from other buildings, yelling obscenities and throwing stones. Other officers arrived. The defendant was taken to the San Juan Tactical Operations Division at Stop 17 ½ in San Juan. <u>Miranda</u>

---

[2] Officer Soto denied that he found the weapon ten minutes later laying on the ground far from the arrest scene of the defendant, or that it was found inside building 25.

[3] The defendant apparently received trauma to his nose, to his side area, a hematoma to the orbit of the right eye which officer Soto alleges occurred when he struggled with the defendant and they fell to the ground.

CRIMINAL 03-0055 (JAG)                              6

warnings were given to the defendant, and the defendant read them and understood him.  The defendant did not have a license to carry a weapon.  The officer did not know the defendant at the time.  The weapon which the defendant was carrying was a Ruger .357 caliber revolver.  The officer did not remember the serial number although it appeared on an arrest report; 15655153 is the serial number.  The revolver was loaded with six bullets when seized.  It was also photographed.  (I.D. 17A.)  The officer had a copy of the photograph but lost it.  The weapon was taken to Forensic Science after it was in the evidence room.  (Ex.18a.)  There is a receipt of evidence delivered at the evidence room, reflecting the date March 31, 2002.  The person delivering the evidence was officer Soto.  The officer recognized the weapon that was seized from Carlos L. Ayala-López on March 31, 2002.  He testified that it had the serial number 15556153, correcting the number to 15655153.  There was also a tag with the weapon, with the agent's name on it.  The ammunition with which the weapon was loaded was also placed in evidence.  (Ex. 20A.)  There were six bullets and officer Soto was the one that unloaded the weapon.

After the arrest, officer Soto took the defendant to the hospital because the defendant complained he had pain in his face and back, and possibly his nose.[4]

---

[4] Although officer Soto's sworn statement shows the arrest date as March 31, 2002, there was some confusion as to which date the arrest occurred since hospital records reflect that treatment was received on March 31, 2002 at 2:00 a.m. and a prescription for Vioxx was dated March 31, 2002. (Ex. 21A, Ex. 22A.) Officer Soto said he went to work on the 30th and 31st of March, but it also appears that on the 30th, he went to work at 8:00 p.m.

CRIMINAL 03-0055 (JAG)                           7

  During the evidentiary hearing, officer Soto looked at the weapon and noted that there were markings under the barrel that were not there when he seized the weapon, and he did not put those markings there.  He seized six bullets and the weapon had not been fired.  The officer did not mark the bullets, although he signed the envelope where they were placed, and the envelope was then sealed.  After the arrest he placed the weapon in his vest until he got to Tactical Operations Division in San Juan, at Stop 17 ½[5] where he put the weapon in the divisions's evidence room.

  Jorge Gordon Meléndez, an attorney who has represented the defendant in two separate state court proceedings, and is very familiar with the Luis Lloréns Torres Public Housing Project,[6] testified at the hearing held on January 31, 2006 that he took pictures at the end of April beginning of May 2002 at the Luis Lloréns Torres Public Housing Project. Those pictures (Exhibits A through E) have different views of Buildings 25 and 26 from Barcarola Street which runs perpendicular to Baldorioty de Castro Avenue and is separated from the avenue by a fence. Mr. Gordon stated that he has been in that area at night and that it is dark.  He testified that the green area next to building 25 cannot be seen from Barcarola Street

---

[5] Stop 17 ½ is an area of Santurce, referenced by an extinct trolley-stop number.

[6] The attorney has several clients who live in the project.

CRIMINAL 03-0055 (JAG)			8

at night time.  He also said that while there is a huge spot light on top of building 26 and two spotlights on top of building 25, normally they are not lit.[7]

## II. DISCUSSION

The revolver and bullets seized from the defendant were obtained as a result of a warrantless search.  It has been firmly established in federal law that warrantless searches are presumed unreasonable and illegal.  The Fourth Amendment to the Constitution gives people the right to be secure against unreasonable government intervention in their person, effects, and home. However, the courts have seen the need to establish certain exceptions to the warrant requirement.  These exceptions are very specific and well-rooted in federal case law. One such exception is a search incident to a valid arrest. The First Circuit explained the requirements for a warrantless arrest in United States v. Meade, 110 F.3d 190, 193 (1st Cir. 1997), quoted in United States v. Alvarado, 59 F. Supp. 2d 329, 336 (D.P.R. 1999), where the court noted: "[a] warrantless arrest requires probable cause, the existence of which must be determined in light of the information that law enforcement officials possessed at the time of the arrest." See United States v. Diallo, 29 F.3d 23, 25 (1st Cir. 1994).  If a warrantless search and seizure falls into one of the well-delineated exceptions, then it is deemed to be a legal and reasonable search.  Katz v. United States, 389 U.S. 347, 357 (1967).

---

[7]The spotlights appear on the edges of the rooftops in these exhibits.

CRIMINAL 03-0055 (JAG)                              9

      Having heard the evidence of the warrantless arrest and search, I find that there was probable cause to believe that the defendant was committing an offense when officer Soto saw him sitting with a revolver tucked into his waistband in a lawn chair on March 30 or 31, 2002. The examination of officer Soto reflected various inconsistencies which are apparent in my outline of the facts as related during the hearing. However, such inconsistencies do not leave me with a distinct feeling that officer Rios either lied or exaggerated. The arrest either occurred or did not occur as related. It is not unbelievable that a person would be sitting in a lawn chair near midnight, 50 or 60 feet from building 25, maybe more, maybe less, and that he would have a revolver tucked into his waistband and in plain view. It is not unbelievable that the officer could clearly see the defendant in the artificial light which bathes the Luis Lloréns Torres Public Housing Project at night. Attorney Gordon testified that the lights normally do not work, which would mean that the area in question would not normally be lit. Exhibits A through E show large square rooftop lights which are pointed to provided illumination at night. The uncontroverted testimony in relation to the evening in question is that there was light. The angle of the trees, according to the pictures (Exhibits A through E), does not appear to prohibit a passenger in a vehicle from seeing what the policeman testified that he saw. If the allegation is that the facts did not occur as stated, or that the weapon was found in building 25, or 10 minutes after the arrest, such a factual allegation presents a triable issue to be presented to the jury. If, however,

CRIMINAL 03-0055 (JAG)                    10

there is a question of law as to whether there was probable cause to believe that a crime was being committed and that a search incident to a valid arrest was performed, I find that the officer had probable cause, and that the search which resulted in the seizure of the loaded revolver was valid as a search incident to a legal arrest.

### III.  DOUBLE JEOPARDY

In his memorandum of law of January 16, 2006, the defendant raises the issue of double jeopardy pointing out that the court should take judicial notice of the Superior Court of San Juan file in case number K LA2002G0273, a criminal case which reflects that the same weapon and bullets seized on March 31, 2002 from the defendant were suppressed by the Honorable Carmen Vargas Medina. The defendant relies on United States v. Sánchez, 992 F.2d 1143, 1150-53 (11th Cir. 1993), rev'd on other grounds, 3 F.3d 366 (11th Cir. 1993), for the proposition that the suppression of such evidence in local court operates as a double jeopardy and collateral estoppel bar to the government's prosecution of the defendant on any charges related to this firearm.  Id.  Balancing the argument, the defense notes that there is disagreement among the circuits on the issue of whether Puerto Rico is a separate sovereign in relation to the federal government.

The law in this circuit, as pointed out by the defense, is that Puerto Rico is a separate sovereign for purposes of double jeopardy.  See United States v. López Andino, 831 F.2d 1164, 1167-68 (1st Cir. 1987); United States v. Vega Figueroa, 984

CRIMINAL 03-0055 (JAG)                               11

F. Supp. 71, 78-79 (D.P.R. 1997). It is well-settled law that jeopardy "attaches" when a trial commences; that is, when a jury is sworn or empanelled or, in a bench trial, when the judge begins to hear evidence. <u>Willhauck v. Flanagan</u>, 448 U.S. 1323, 1325-26 (1980); <u>United States v. Martin Linen Supply Co.</u>, 430 U.S. 564, 569 (1977); <u>United States v. Serfass</u>, 420 U.S. 377, 388 (1975) (internal citations omitted); <u>United States v. Bonilla Romero</u>, 836 F.2d 39, 42 (1st Cir. 1989). In Bonilla Romero, the court held that jeopardy did not attach as a result of the suppression of evidence ordered after hearing by the Puerto Rico Superior Court and the subsequent dismissal of charges under Puerto Rico law. <u>Id.</u> The conflict between the circuits is resolved by following the law in this circuit, which is not only controlling but convincing. Cf. <u>United States v. Bouthot</u>, 685 F. Supp. 286, 293 (D. Mass. 1988). Finally, the fact that "death is different" does not weigh in this recommendation. Both sides have a right to a fair trial and a defendant facing a death penalty has procedural safeguards which are apparent from this litigation. This does not mean that the government is not entitled to present evidence it would be able to produce in a non-death penalty trial.

In view of the above, I recommend that the motion to suppress be denied in its entirety.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this

CRIMINAL 03-0055 (JAG)                    12

report and recommendation.  The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections.  Failure to comply with this rule precludes further appellate review.  See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

    At San Juan, Puerto Rico, this 3rd day of February, 2006

                                             S/ JUSTO ARENAS
                              Chief United States Magistrate Judge