IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.

[1] CARLOS L. AYALA-LÓPEZ,
[10] EUSEBIO O. LLANOS CRESPO,

Defendants

CRIMINAL 03-0055 (JAG)

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
(Docket No. 580, supplemented by Docket Nos. 841, 843;
opposition Docket No. 680) (Arrest of February 28, 2002)

This matter is before the court on motion to suppress evidence filed by the defendant Carlos L. Ayala-López on July 20, 2005. (Docket No. 580.) The United States opposed the motion on October 6, 2005. (Docket No. 680.) The defense supplemented the motion to suppress on January 24, 2006 based upon grounds of double jeopardy and collateral estoppel (Docket No. 843) and loss of evidence. (Docket No. 841.) The defense moved for suppression based upon the argument that on February 28, 2002, he was stopped, detained, searched and arrested without probable cause or reasonable suspicion. He also argues none of the actions of the police on that day were justified by the stop and frisk doctrine announced by Terry v. Ohio, 392 U.S. 1 (1968), and that therefore, the stop, detention, search and arrest were illegal. The defendant concludes that the physical evidence seized from him on

CRIMINAL 03-0055 (JAG)                    2

that date must be suppressed on the grounds that it was obtained in violation of the Fourth Amendment guarantee against unreasonable searches and seizures.

## I.  FACTUAL BACKGROUND

Co-defendant Ayala-López argues in his motion of July 20, 2005 (Docket No. 580) that the stop, search, detention, and arrest of February 28, 2002 was illegal, conducted without reasonable suspicion or probable cause, and violated the Fourth Amendment, particularly since a local judge found no probable cause for the arrest. He also argues that the arresting officers had neither a valid arrest nor search warrant to support their actions.  As a consequence, he argues that all incriminating items seized from him, especially a .45 caliber Colt pistol, be suppressed.  On the date in question, the defendant was located in the Luis Lloréns Torres Public Housing Project and was arguably not conducting any illegal activity when he was arrested without a warrant according to the argument of the defense.  The defense concludes that whatever suspicion the arresting officers had was neither objective nor based upon any particular or specific activity that they had observed.

The United States replies in its memorandum of October 6, 2005 (Docket No. 680) that on the mid-afternoon of February 28, 2002, officer Enrique Seda Díaz was conducting a routine patrol with his partner, officer Ángel Rivera Jiménez, on bicycles, within the Luis Lloréns Torres Public Housing Project, and that they heard several shots fired.  They then heard children screaming and observed an individual with a gun in his hand.  This person was later identified as Carlos L. Ayala-López.

CRIMINAL 03-0055 (JAG)                              3

When the defendant saw the police officers, he fled. In pursuit, officer Seda Díaz never lost sight of the defendant and when the defendant reached the entrance to one of the buildings within the public housing project, officer Seda Díaz drew his weapon and ordered the defendant to stop, and put his gun down. The defendant complied with the officer's directive. Officer Seda Díaz then placed the defendant under arrest. The officer recovered the pistol and during a search incident to arrest, officer Seda Díaz recovered from the pants pocket of the defendant two pistol magazines, one containing six bullets and the other 10. The magazine inside the pistol, a .45 caliber Colt pistol, Model M-19, Serial No. 119-6906, was empty. The government thus concludes that the arrest was based upon sufficient probable cause to believe that the defendant had committed a crime. The government argues that regardless of the state court's determination, this court is not bound by it. It stresses that the state court's analysis and reasoning bears no relevance here.

At the evidentiary hearing held on January 12 and 18, 2006, Police of Puerto Rico Officer Enrique Seda Díaz testified that he has been a policeman for seven years and is currently assigned to the town of San Germán. Prior to the current assignment, he was assigned to station 108 of the Luis Lloréns Torres Public Housing Project. While assigned there, he conducted preventive patrol, focusing on drug points and the security of the residents. On February 28, 2002, he was on bicycle patrol with a co-worker, officer Ángel Rivera Jiménez, when, at about noon, he heard shots being fired from the Calle 4 sector of the Project. He himself was on

CRIMINAL 03-0055 (JAG)                    4

a sidewalk in front and on the west side of the Lloréns Torres School at the time. From where he was, he could not see from where the shots came because there was no visibility. He called on radio that there were shots fired at the Calle 4 sector of the project in front of the dispensary. The shots came from the east side of the dispensary. He did not know how many shots were fired but there was only one weapon used. Hearing the noise coming from the direction of the dispensary, officer Seda went toward the area from where the shots rang out on his bicycle, and officer Rivera went with me. Officer Seda saw children yelling and running and then saw the defendant Ayala-López, whom he knew from sight and with whom he sometimes talked, running with a black weapon in his right hand toward another project sector called Las Picúas. (See i.d. 23A.)[1] The officer intercepted the defendant at the intersection near the "music building", and running toward the west. Officer Seda recognized the co-defendant and yelled at him, "Stop, motherfucker. Don't run." The co-defendant kept running through the project buildings. The co-defendant ran toward building 92 where the girlfriend of Luis Lloréns, who controls the Las Malvinas drug point and is co-defendant's friend, lives. (The co-defendant and Luis Lloréns always would hang out together. The Calle 4 drug point and the Las Malvinas drug point were always at war.) Although the co-defendant went around corners, the officer did not lose sight of the co-defendant while chasing him. (See

---

[1] I.d. 23A is a part of the Luis Lloréns Torres Public Housing Project which shows the Las Picúas area, the police station, the CDT and the school area, as well as building 92.

CRIMINAL 03-0055 (JAG) 5

i.d. 23A, i.d. 24A.)[2]  He ran along the west side of building 94, turned north and ran between buildings 92 and 93, then turning west in front of building 92.[3]  He turned two corners.[4]

At building 92, the co-defendant stopped at the front (north) side near the northeast corner of the building.[5]  The co-defendant tried opening the gate to the building but the officer threw his bicycle at the co-defendant.  The bicycle hit the gate.  The officer then unholstered his weapon.  Officer Seda's partner was with him.  The officer gave the co-defendant the instruction to get on the ground.[6]  The co-defendant did not drop on the ground but threw the weapon on the ground in front of the entrance gate and raised his hands.  The officer then handcuffed him and placed him under arrest.  The officer took the co-defendant's weapon, other

---

[2] I.d. 24A is a photograph of part of the Luis Lloréns Torres Public Housing Project which shows the Las Malvinas section at its lower left, and Las Picúas at the upper right.

[3] I.d. 25A is a picture of building 92 taken from the north-east part of the building showing the basketball court and bleachers.

[4] Whether officer Seda lost sight of the defendant as he ran was an issue at the evidentiary hearing.  The officer testified that he chased the defendant between buildings, crossed the street, chased him around corners, edges, and buildings although the defendant did not run among the trees.  He insisted he never lost sight of the defendant.

[5] Officer Seda testified when shown a picture of building 92 with bleachers in front of the basketball court that he ran from left to right in front of the building, behind the bleachers, but did not recall if the bleachers were there on February 28, 2002.  He was about ten feet from the defendant as they ran.

[6] The defendant did not enter any apartment in the building.

CRIMINAL 03-0055 (JAG)                6

officers arrived, and officer Seda walked back to the police station with the co-defendant, since people were starting to arrive at the arrest scene.

At the police station, the co-defendant was searched. Two pistol magazines were found in his front pants pockets, one magazine with six rounds in it, the other with 10. The magazine inside the weapon was empty. The officer recovered no spent shells nor fired projectiles nor did he see strike marks from bullet hits. The officer noted that he can distinguish firecrackers from firearms. He did not get the weapon from the dirt near the building and did not make any transmission that he was looking for the weapon. Officer Seda noted that upon arresting the defendant, he took the weapon and put it in his waist band, frisked the defendant quickly and took him to the police station. There he found the two magazines, one in each pocket, and some cash. The defendant had three–$100, thirteen–$20 and six–$10 bills. Later a local judge found no probable cause for the case.

During the evidentiary hearing, Exhibit 14A, a firearm was shown to officer Seda but the same did not have his initials on it. The officer did not lift any prints. Exhibit 15A was a bag containing one cartridge and a black object: a magazine. Officer Seda did not know where the other magazines were. His initials were not on this magazine, although he testified that he was sure that the magazine was the one. "For me, I'm sure that's the magazine for the weapon," he stated. He submitted the evidence locally as required to the property clerk. Two magazines remain missing

CRIMINAL 03-0055 (JAG)                    7

and the witness has not found them yet.  Officer Seda is responsible for the lost magazines.

Officer Seda Díaz did not see the co-defendant actually shooting and did not recall what the defendant was wearing on that day.

## II. DISCUSSION

It has been firmly established in federal law that warrantless searches are presumed unreasonable and illegal.  The Fourth Amendment to the Constitution gives people the right to be secure against unreasonable government intervention in their person, effects, and home.  The constitutional requirement of obtaining a warrant from an impartial magistrate, before a search and seizure can legally occur, is one of the fundamental tools instilled in our system of checks and balances to protect personal freedoms and rights.  If a warrantless search and seizure falls into one of the well-delineated exceptions then it is deemed to be a legal and reasonable search.  Katz v. United States, 389 U.S. 347, 357 (1967).

A warrantless search can be legally conducted as a search incident to an arrest, one of the clear exception to the warrant requirement of the Fourth Amendment.  United States v. Robinson, 414 U.S. 218 (1973).  The Supreme Court established that the scope of a search incident to an arrest is the person of the arrestee and the area immediately surrounding him.  Chimel v. California, 395 U.S. 752, 762-63 (1969); Knowles v. Iowa, 525 U.S. 113, 116 (1998).  The rationale

CRIMINAL 03-0055 (JAG)                              8

used by the court was based on a concern for the safety of officers while performing an arrest.

Officer Seda heard shots fired. He then proceeded to the area from where the shots were fired and saw an individual whom he recognized, with a weapon in his hand. That individual ran or fled, and the officer gave chase. Evidence of flight adds to a reasonable suspicion that such individual is committing an offense. The defense argues that mere presence in the Luis Lloréns Torres Public Housing Project is insufficient cause to be arrested. However, if certain facts are believed by me to have probably occurred based upon the evidence presented at the hearing, and if those facts when added up are articulable enough to establish a basis for the chase and arrest, then only factual allegations remain for a jury to consider, that is, whether the defendant did carry the .45 caliber Colt pistol on February 28, 2002. This is not the case of a hunch on the part of the arresting officer. Cf. United States v. Golab, 325 F.3d 63, 66 (1st Cir. 2003) (quoting Terry v. Ohio, 392 U.S. at 27). The officer hears shots, sees an individual who sees him and who is running in the direction of Las Picúas, weapon in hand. The officer gives chase as the individual continues to run. These are sufficient articulable facts to believe that such an individual is committing a crime. See United States v. Arvizu, 534 U.S. 266, 273 (2002) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. at 30); see also United States v. Cortez, 449 U.S. 411, 417 (1981) (An investigatory stop must be justified by some objective manifestation that the person stopped is, or

is about to be, engaged in criminal activity)); United States v. Vargas, 633 F.2d 891, 896-98 (1st Cir. 1980).

## DOUBLE JEOPARDY/COLLATERAL ESTOPPEL

In his supplement to the motion to suppress and to exclude evidence filed on January 24, 2006, the defendant raises the issue of double jeopardy pointing out that the court should take judicial notice of the San Juan Municipal Court finding of no probable cause and that the local case was dismissed. Again, the defendant relies on United States v. Sánchez, 992 F.2d 1143, 1150-53 (11th Cir.), rev'd on other grounds, 3 F.3d 366 (11th Cir. 1993), for the proposition that the dismissal of the weapons charge in local court operates as a double jeopardy and collateral estoppel bar to the government's prosecution of the defendant on any charges related to the firearm and ammunition. I repeat in part what I have previously noted in other recommendations.

Puerto Rico is a separate sovereign for purposes of double jeopardy. See United States v. López Andino, 831 F.2d 1164, 1167-68 (1st Cir. 1987); United States v. Vega Figueroa, 984 F. Supp. 71, 78-79 (D.P.R. 1997). "It is . . . well-settled law . . . that jeopardy 'attaches' when a trial commences; that is, when a jury is sworn or empanelled or, in a bench trial, when the judge begins to hear evidence." United States v. Bonilla Romero, 836 F.2d 39, 42 (1st Cir. 1989) (citations omitted). In Bonilla-Romero, the court held "that jeopardy did not attach as a result of the suppression of evidence ordered after hearing by the Puerto Rico Superior Court and

CRIMINAL 03-0055 (JAG)          10

the subsequent dismissal of charges under Puerto Rico law." Id. The conflict between the circuits is resolved by following the law in this circuit. Cf. United States v. Bouthot, 685 F. Supp. 286, 293 (D. Mass. 1988).

## LOSS OF EVIDENCE

The defendant argues in his supplemental motion of January 24, 2006 (Docket No. 841) that the government has lost the two pistol magazines and sixteen bullets seized on February 28, 2002, and that the existence of the missing physical evidence is material to his defense, that is to his guilt and punishment.

The cases of California v. Trombetta, 467 U.S. 479 (1984) and Arizona v. Youngblood, 488 U.S. 51 (1988), "together established a tripartite test to determine whether a defendant's due process rights have been infringed by law enforcement's failure to preserve evidence." United States v. Femia, 9 F.3d 990, 993 (1st Cir. 1993) (citing Griffin v. Spratt, 969 F.2d 16, 21 (3rd Cir. 1992); Jones v. McCaughtry, 965 F.2d 473, 476-77 (7th Cir. 1992); United States v. Rastelli, 870 F.2d 822, 833 (2d Cir. 1989)).

In Trombetta, the Court stated: "Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably

CRIMINAL 03-0055 (JAG)                                    11

available means." <u>California v. Trombetta</u>, 467 U.S. at 488-89 (footnote and citation omitted). In <u>Youngblood</u>, the Court added a third element, holding that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of the law." <u>Arizona v. Youngblood</u>, 488 U.S. at 58; <u>United States v. Femia</u>, 9 F.3d at 993. "A defendant who seeks to suppress evidence formerly in the government's possession therefore must show that the government, in failing to preserve the evidence, (1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and, which (3) is to some extent irreplaceable. Thus in missing evidence cases, the presence or absence of good or bad faith by the government will be dispositive." <u>United States v. Femia</u>, 9 F.3d at 993-94; <u>see</u> <u>United States v. Arache</u>, 946 F.2d 129, 136-37 (1st Cir. 1991). The defendant has not made a showing that its existence and/or use at trial would prove exculpatory. <u>Cf.</u> <u>United States v. Femia</u>, 9 F.3d at 994. The pistol magazines evidence is missing without explanation. Agent Seda testified that he had delivered the pistol magazines but that they were lost. He was not the one that delivered the missing evidence to the Forensic Sciences Institute although he had taken firearms there before. Nevertheless, there is no hint that bad faith accompanied the disappearance of the pistol magazines. <u>See</u> <u>United States v. Shea</u>, 211 F.3d 658, 668 (1st Cir. 2000); <u>United States v. Marshal</u>, 109 F.3d 94, 97-98 (1st Cir. 1997). Whether there was negligent destruction remains an unanswered question. However, the motivation

CRIMINAL 03-0055 (JAG)                    12

of the federal government in participating in the disappearance of the pistol magazines is essential. And there is no evidence that the federal government participated in the disappearance of the evidence.

The defendant must make a showing that the [government] was somehow improperly motivated. United States v. Gallant, 25 F.3d 36, 39 n.2 (1st Cir. 1994), quoted in United States v. Garza, No. 04-2400, slip op. at 5, 2006 WL 163610, at *2 (1st Cir. Jan. 24, 2006). Again, there is no evidence of any improper motivation in the loss of the evidence, assuming the same is not produced before trial.

### DEATH IS DIFFERENT

Finally, the defendant asks the court to recognize, as it must, that "death is different" in resolving the lost evidence issue in its favor. Of course, death is different in kind from all other criminal sanctions, Woodson v. North Carolina, 428 U.S. 280, 305 (1976), and "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. Id. (footnote omitted). All of the cases I have read, however, focus on the penalty phase of the death prosecution when they coin the phrase "death is different" or refer to the unique penalty and the need for safeguards in defending the rights of the defendant at that stage. See Ring v. Arizona, 536 U.S. 584, 586-87 (2002); Monge v. California, 524 U.S. 721, 731-34 (1998); Ford v. Wainwright, 477 U.S. 399, 411-12 (1986); Caldwell v. Mississippi, 472 U.S. 320, 329-30 (1985). Whether the fact that death is different means that

CRIMINAL 03-0055 (JAG) 13

the government is not allowed to strike fair blows at the guilt or innocence stage of court proceedings remains to be seen.

### III.  CONCLUSION

The arrest of the defendant performed on February 28, 2002 was valid because it was based upon a reasonable suspicion supported by a weighing of articulable facts that a crime was being committed and that the defendant was committing the offense. The search of the defendant resulting in the seizure of a weapon was a valid search incident to a legal arrest. The subsequent search at the police station which lead to the recovery of the two pistol magazines and sixteen bullets was either a continuation of the search incident to arrest, or an inventory search which is standard after an arrestee is taken into custody. The subsequent loss of the pistol magazines does not render evidence of their then existence and identity inadmissible. The dismissal at the preliminary hearing stage of the local charges based on the same seizures of February 28, 2002 does not bar subsequent prosecution for the same facts in this court under either double jeopardy or collateral estoppel. Finally, that death is different is not a factor to be taken into account at the innocence/guilt stage of the process.

Therefore, it is my recommendation that the motion to suppress the evidence seized on February 28, 2002 be denied.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection

CRIMINAL 03-0055 (JAG)                    14

thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 9th day of February, 2006.


                                          S/ JUSTO ARENAS
                                    Chief United States Magistrate Judge