IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

Plaintiff

v.                                                    CRIMINAL NO. 03-0055 (JAG)

[1] CARLOS L. AYALA-LÓPEZ,
[10] EUSEBIO O. LLANOS CRESPO,

Defendants

AMENDED MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]
(Docket No. 597; opposition Docket No. 673)

On July 27, 2005, co-defendant Carlos L. Ayala-López moved to suppress or exclude Veteran's Administration (hereinafter "VA") Videotape, and Still Photos (excerpt) under Rule 403, and the Fourth, Fifth, Sixth and Eighth Amendments of the United States Constitution, and for a Pretrial Carbone hearing.  (Docket No. 597.)  The images subject of the motion in limine by the defense denote the killing of Veteran's Administration Police Officer José O. Rodríguez Reyes on the night of April 24, 2002.  The defendant questions the accuracy, reliability, viewability, authenticity, and admissibility of the VA video.  The specific objections to the VA videotape and excerpt and still photos taken from the VA video tape are many and they are listed below:

1)   They do not accurately reproduce the incident that took place;

2)   They are unclear, dark and blurry;

---

[1]This report and recommendation is amended primarily to include a section dedicated to the authenticity of the videotape in question since allegations that the videotape may have been tampered with were made at the evidentiary hearing held on January 18, 2006.

CRIMINAL 03-0055 (JAG)                    2

3)    The videotape is in high-speed and cannot be viewed;

4)    The videotape contains the incorrect time and date and has a TV commercial in its midst, thereby evidencing its unreliability and inadmissibility;

5)    They suffer from technical deficiencies which make them untrustworthy and unreliable;

6)    They lack the requisite foundational basis necessary for admissibility;

7)    They are vague and unclear and do not permit the viewer to ascertain with reasonable reliability the participants in the incident or their actions;

8)    They will cause the jury to arrive at the interpretation of the alleged incident at the VA Hospital based upon mere speculation and imagination;

9)    They are taken out of context and are incomplete, misleading, and unreliable;

10)   They are poor;

11)   Their probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or waste of time;

12)   They have been improperly enhanced resulting in their modification and unreliability;

13)   They are not and cannot be authenticated;

14)   They are more misleading than helpful;

15)   They are erroneous and misleading;

CRIMINAL 03-0055 (JAG)                    3

16)   They do not properly capture the incident in real time, as they omit seconds from each frame and thereby mislead the viewer as to the actions of those individuals depicted therein.

The defendant cites in his motion <u>United States v. Carbone</u>, 798 F.2d 21 (1st Cir. 1986), in support of the request for a hearing to determine the admissibility of the videotape and excerpts.

The government responds that the videotape is generally trustworthy and accurately recorded the occurrence of April 24, 2002. Using audibility analogy, the government argues that the tape is admissible unless unviewable portions are so substantial as to render the recording as a whole untrustworthy. <u>See United States v. Tisor</u>, 96 F.3d 370, 376 (9th Cir. 1996). The government also stresses that the viewability goes to the weight and not to the admissibility of the videotape. The proffer of the government is that the videotape depicts the murder of officer Rodríguez to the point where officer Rodríguez is laying on the ground dead –all in five seconds. However, the picture quality would arguably go to the weight of the evidence. The United States concludes in emphasizing that the evidence passes a Rule 403 test since the videotape is relevant and probative, particularly if considered with other evidence. At the same time, the evidence is not unfairly prejudicial, confusing, or misleading.

The motion was called for hearing on January 18, 2006, and further hearings were held on January 31, February 7, and 8, 2006, and earlier today. At the January 18, 2006 hearing, the government played the time-lapse video and composites on a CD-ROM. (See Ex. 32A.) The exhibit, a multiplex digital video, contains four viewable quadrants, each playable separately and each showing the

CRIMINAL 03-0055 (JAG)                    4

death in a different manner, i.e., time lapse, slow down, isolated image.  The manner of murder is clearly depicted if not the visages of the perpetrators.

In United States v. Carbone, 798 F.2d at 24, the First Circuit explained that when the government seeks to present tape recordings as evidence, "[t]he government has the duty of laying [the proper] foundation [to establish] that the tape recordings accurately reproduce the conversations that took place, i.e., that they are accurate, authentic, and trustworthy."  Once this is done, then the party challenging the admissibility of audio tapes has the burden of demonstrating that the recordings are inaccurate. Id. (quoting United States v. Rengifo, 789 F.2d 975, 978-79 (1st Cir. 1986)).  Furthermore, the generally accepted rule is that when the challenge is to the audibility of the recordings, the question is "whether 'the inaudible parts are so substantial as to make the rest more misleading than helpful. . . .'" Id. (citations omitted).  Admissibility of such tapes rests within the discretion of the trial judge. Id.; see also United States v. Brassard, 212 F.3d 54, 57 (1st Cir. 2000); United States v. Bernal, 884 F.2d 1518, 1523-24 (1st Cir. 1989).

The video recording subject of the motion clearly shows what the government intent to present it for:  the murder or killing of officer Rodríguez.  Someone approaches the officer, raises his right arm to the officer's head inside the guard shack, and the officer falls out to the street where it appears that the perpetrator does something, probably placing a shot, to the officer's head as the officer is on his knees.  The officer falls; the aggressor and accomplice leave.  People appear on the scene almost immediately.  This evidence is blurry and the scenes are taken at night with artificial light. Cf. United States v. Bynum, 567 F.2d 1167, 1170-71 (1st Cir. 1978).  I cannot conclude that the unviewable parts are so substantial as to make the rest of the viewing more misleading than helpful.  Furthermore, there is nothing

CRIMINAL 03-0055 (JAG)                    5

improper or irregular about the use of the VA composite photos, which are like summaries, to render them inadmissible.  See United States v. Frokjer, 415 F.3d 865, 870-71 (8th Cir. 2005); United States v. Rivera Maldonado, 194 F.3d 224, 236-37 (1st Cir. 1999).

### ALLEGATIONS OF TAMPERING

The defendant alleges that the video tape was tampered with.  Evidence of chain of custody and possible tampering was presented through the testimonies of various law enforcement officers.  However, having heard those witnesses, I conclude that the videotape has not been tampered with.

Pedro Flores Torrent, a retired lieutenant, as of June 3, 2005, with the Veterans Administration Security Police Force, testified that he first observed a videotape of the death of José Rodríguez weeks after the fact.  Together with him were Jorge Cruz, the Chief of the force, and detective Marcos Márquez, and possibly Antonio Falú Santos.  The tape was fresh in his mind.  It began at 7:35 p.m. and ended at 8:10 to 8:15 p.m.  It was a time lapse video and he saw it clearly. Mr. Flores did not remember seeing another video except for that one time.  He said he never commented with anyone that the video had been tampered with, and that when he watched it, he was attentive and saw nothing irregular.

Detective Marcos Márquez of the Veterans Administration Medical Center testified that on April 24, 2002, he was the primary evidence custodian at the hospital.  Having received a call that night, he went to the hospital and received two surveillance videotapes from the command center, although he did not recall who gave him the tapes.  The tapes are changed at 7:00 a.m. and 7:00 p.m.  (One tape begins on April 24, 2002 at 7:00 a.m. and the other at 7:00 p.m.)  He identified the videotape of April 24, 2002 which began at 7:00 p.m. (see Ex. 50A), which

CRIMINAL 03-0055 (JAG)                    6

contained the signature of Roberto Cruz, and of agent/detective Samuel Morales on an evidence form number 2534.[2]  (See Ex. 51A.)  Detective Márquez did not view the videotape that night, did not make a copy of the tape, and saw the tape months later when he showed it to other people following the instructions of Chief Jorge L. Cruz. He showed the tape seven to twelve times, and was always present when he showed it. Detective Márquez noted that the tape cannot be played at a normal speed, but rather too fast or too slow.  He said that the videotape did not reflect the whole incident but that he had seen it from beginning to end.  Detective Márquez said he did not show the tape to Lieutenant Falú but might have shown it to Pedro Flores Torrent.  He recalled that in the copy, a part of the tape went blank.  (He saw a digitized copy of the video.)  (See Ex. 32A.)  He did not see the whole incident of April 24, 2002 in the copy of the tape.

Detective Márquez noted that the original tape has sixteen images and the multiplex is the only machine that can show the sixteen images.  Viewing the video in court (Ex. 50A) he said that it showed the same images that he had previously seen, comparing Exhibit 50A with Exhibit 32A.

Héctor Guzmán, a Veterans Administration Police Officer for 14 years testified that he had seen the videotape, and he had talked to Pedro Flores and Lieutenant Antonio Falú separately and that they had said that they had seen the tape, and that they had seen one thing first and then another version.  Officer Guzmán sent an e-mail relating those incidents where he writes his conclusions that the two protested

---

[2]Evidence or Property Custody Record, VA Medical Center.

CRIMINAL 03-0055 (JAG)                    7

the "tampered evidence".  (See Ex. F.)  He himself never saw the videotape, and the word tampered was his word, not theirs.[3]

Samuel Morales has worked for the Police of Puerto Rico for 24 years, 14 years of which he has worked as a detective.  On the evening of April 24, 2002, he went to the murder scene at the Veterans Administration Hospital as a preliminary investigator for the CIC[4], and was given two videotapes by Marcos Márquez who retrieved them from two video cassette machines, both signing a form at 1950 hours (7:50 p.m.)[5] (Ex. 51A.) and took the videotapes to the CIC evidence box at the second floor of police headquarters, where the headquarters of the CIC is located.  At the CIC, the tapes were placed in the evidence box, where the desk officer has the key.  The next person to pick up that evidence would sign a form.

Agent José Carrión Colón was assigned to the case and detective Morales never saw the videotapes again.

Antonio Fox Núñez has been a police officer for 19 years and was working with a Police of Puerto Rico FBI Task Force on April 24, 2002.  He was given a letter from his supervisor which was a directive for the custodian of the videotapes to hand them over to him. (See Ex. 53A.)  On April 26, 2002, he went to police headquarters to retrieve the videotapes. (See Ex. 52A.) This is the first time he sees

---

[3]Officer Guzmán said that there were management problems that had nothing to do with Lieutenant Falú or officer Flores, that there were discrimination problems at the VA, and that there was disparate treatment by supervisor Jorge L. Cruz Sánchez, whom he did not like.

[4]Cuerpo de Investigacion Criminal, i.e., Criminal Investigation Corps, the Puerto Rico equivalent of the F.B.I.

[5]The time of the report and the time evidence was obtained appear to be the same.

CRIMINAL 03-0055 (JAG)                    8

the videotapes.  After retrieving the tapes at headquarters from officer José Carrión Colón who was given the tapes by someone in the evidence room, officer Fox took them to the FBI to make working copies[6] and then stored the originals of the videos in his desk at GSA Guaynabo where he stored them under lock and key on April 26, 2002, at 5:00 p.m., his having the only key to the locker.  He later took the tapes out and gave them to FBI Agent Harry Orta.  (See Ex. 54A.)  This occurred in July, 2002.  Agent Orta received them and took the videotapes to the ELSUR (Electronic Surveillance) Room at the FBI office where video cassettes and cassettes are stored. There is a combination lock on the door and one person is in charge.  Eledis Lugo received the evidence and signs for it.  Officer Fox only used working copies of the videos.

Officer Fox viewed the videotape of the death of the VA officer.  A special system was needed to see it.  There were fast images from different cameras.  When the copies were made, officer Fox took the originals and placed them back in his secure desk drawer at GSA Guaynabo.  Nobody else had access to the locked drawer.[7] Officer Fox stopped working on the case in July 2002.

José Carrión Colón, Police of Puerto Rico, has been a homicide agent for ten years.  He was assigned to the murder case on April 25, 2002.  He read a report about the murder scene, noting that officer Morales had retrieved physical evidence at the scene, two video cassettes.  These were located at the CIC and were in the custody of the desk sergeant (retén).  On the same date, officer Carrión went to the

---

[6]Officer Fox gave a working copy to a supervisor at the VA, Danilo Whittaker. The copy was to go to Miami to his superiors at the VA.

[7]The team working on this investigation was composed of police officer Roberto Díaz, FBI Special Agent Ken Darcey, and officer Núñez Fox.

CRIMINAL 03-0055 (JAG)                    9

desk sergeant and watched as the desk sergeant retrieved the tapes, one of which is Exhibit 50A, from a metal box on the floor and gave them to officer Carrión who then took them to the evidence room where officer Class was in charge.[8]  The videos remained in the evidence room until April 26, 2002, at 10:00 a.m., when officer Núñez arrived with a document and withdrew the tapes from the evidence room. Officer Class gave officer Carrión the tapes and officer Carrión gave the tapes to officer Núñez.  (See Ex. 56A.)  The CIC evidence room is on the second floor close to the area of the duty sergeant.  The duty sergeant has a metal box where evidence is stored, like an armoire.  The CIC evidence room contains a metal fencing or cage behind a desk.  Officer Class is the only one authorized to be at the evidence room. Officer Carrión did not go to the crime scene.[9]

Lieutenant Antonio Falú Santos, Veterans Administration Police Force, has worked for the VA for 17 years.  He saw the video of the events of April 24, 2002 a month after the death of José Rodríguez.  Mr. Jorge Cruz and detective Marcos Márquez showed the videotape to him once or twice, probably twice, although he did not remember if it was on the same day.  When he saw a second viewing of the videotape, he thought there was a discrepancy.  Specifically, he saw action in relation to an exiting medium-size vehicle which appeared on the videotape the first time which did not appear in the tape during the second viewing.  The viewing was

---

[8]The distance between the desk sergeant (retén) and the CIC evidence room located on the second floor is about 20 to 25 feet.

[9]On February 9, 2006 (Docket No. 874), the United States filed a motion correcting testimony regarding the chain of custody and requested permission to call witness Sergio de Jesús Torres to testify as to the chain of custody.  Co-defendant Ayala-López objected to this motion on February 10, 2006.  (Docket No. 884.)  The motion was granted and a hearing set for today.

CRIMINAL 03-0055 (JAG)                    10

six to eight minutes.  Lieutenant Falú felt that the second videotape was not the same as the first videotape, and stated that officer Flores agreed with him that one scene was not in the previously viewed videotape.  The scene in the video with the vehicle lasted a total of five to six seconds, and the scene where the shooting occurs was one or two minutes after the vehicle appears.  He noted that it was possible that a shorter version of the videotape might have been shown the second time.

Today, Police of Puerto Rico Officer Sergio de Jesús Torres testified that he has worked  for 19 to 20 years as a policeman, in homicide, robbery, and the special arrests and extradition division of the police department.  On April 25, 2002, officer de Jesús worked for CIC in San Juan, homicide division, performing administrative work.  He was in charge of preparing the case files of the cases that had begun the night before, or early in the morning of the same day, cases concerning murder or assaults.  He explained that the evidence is gathered and brought to the duty desk sergeant.  Officer de Jesús would pick up the evidence from the desk sergeant.  The investigative officer would compile the evidence of the case, part of that evidence would go to the Institute of Forensic Medicine and the rest would go to the desk sergeant.  An entry would be made in the book of the desk sergeant, a case number would be assigned, and the agent signs the desk sergeant's book.  The persons handing in the evidence and retrieving the evidence from the CIC evidence deposit box would also sign it.  (See I.d. 58A.)

In this particular case, the desk sergeant's book page was signed by officer de Jesús, officer Samuel Morales, and officer J. Ortiz, badge number 24487, the latter of which gave the evidence to officer de Jesús, whose  signature appears on the upper left hand margin written vertically.  (See Ex. 58A.)  Officer de Jesús picked up the evidence on April 25, 2002, at 9:06 a.m., per the notation.  (Officer de Jesús

CRIMINAL 03-0055 (JAG)                    11

did not remember anything from personal knowledge but did remember giving officer Carrión the two videotapes and writing on documents.)[10]  J. Ortiz is the name under officer de Jesús' name and is the officer who gave him the evidence.  Once officer de Jesús picked up the evidence on that date, he found out from the supervisor which agent was handling the case and handed over the evidence to the officer with a receipt.  A receipt of seized property (see Ex. 57A) for two videotapes shows they were retrieved by officer José R. Carrión Colón on April 25, 2002, at 9:15 a.m., from officer de Jesús.  Two videotapes are described on the receipt, identified with number 2002-1-282-06130, homicide.

Officer de Jesús found the book with the CIC duty officer in San Juan, talked to officer López and asked for the 2002 evidence entry book.  He looked in the book and found the entry of evidence he was looking for.  Exhibit 58A was not copied in his presence but he recognized it as being the same page 50 he saw in the book and also recognized his signature.  He also saw it in the evidence book at the CIC so he knew it is a copy of the same.  None of the other signatures on the page are his.  Officer de Jesús' badge number is 12742.  Officer Torres, badge number 1905, should have been the duty officer in charge and is probably retired now.

---

[10]Officer de Jesús was contacted about this case via telephone call by FBI Special Agent Orta two days prior to the hearing and in relation to the murder of a VA hospital policeman.  Agent Orta asked about the videos that had been picked up from the duty officer at  the CIC and wanted to verify if officer de Jesús was part of the chain of custody.  Agent Orta asked officer de Jesús to look at the desk sergeant's book in the CIC to see if he had picked up videotapes.  Agent Orta wanted to verify who picked up the videos and to whom they were handed over.  Officer de Jesús also spoke to Assistant United States Attorney Rodríguez during the same telephone call about the chain of custody.  Officer de Jesús was told he was involved in the chain of custody and was going to be summoned.  He was instructed to retrace steps he had taken years before.  Officer de Jesús then went to the evidence book.

CRIMINAL 03-0055 (JAG)                    12

Upon request of officer de Jesús, officer Ortiz got the videos from where the evidence is kept at the CIC duty station, in the room where the evidence is found, behind the duty officer. Other people are not allowed in there, which is where the evidence is kept under padlock, according to the norm. Officer de Jesús assumed that he received the videotapes "loose".

The time written in Exhibit 57A refers to his giving the videotapes to officer Carrión Colón. Since Exhibit 58A is signed at 9:06 a.m., it took nine minutes to give him the videotapes. Officer de Jesús did not give the videotapes directly to officer Carrión Colón (but rather nine minutes later) because officer Carrión Colón was not in the evidence room and did not know he was going to be assigned that case.

"Factors to be considered in making this determination of admissibility [of physical evidence] include the nature of the article, the circumstances surrounding its preservation and custody, and the likelihood of others tampering with it." United States v. García, 718 F.2d 1528, 1533-34 (11th Cir. 1983). Before the videotape subject of the motion to suppress is admitted into evidence, the proponent (the United States) first must authenticate the evidence by demonstrating to the court that there is a reasonable probability that the evidence "is what its proponent claims." Fed. R. Evid. 901(a); see United States v. Collado, 957 F.2d 38, 39-40 (1st Cir. 1992). The trial court must be able to determine that it is reasonably probable that there was no material alteration of the evidence after it came into the custody of the proponent. Id.

The paper trail, with its omissions and variations, allows for a court to determine that the evidence is authentic or that there might have been tampering with the same. A break, or two or three, in the chain of custody is not grounds for suppressing the physical evidence subject of the break. See United States v. Luna,

CRIMINAL 03-0055 (JAG)                    13

585 F.2d 1, 5-6 (1st Cir. 1978). Even clear error in numbering or some other detail, like a missing signature, does not cause the evidence to be justiciably infirm. See United States v. Abreu, 952 F.2d 1458, 1467-68 (1st Cir. 1992). "A possible defect in the chain of custody for a certain piece of evidence factors into the weight given to the evidence rather than its admissibility." United States v. Rodríguez, 162 F.3d 135, 144 (1st Cir. 1998). "A defendant can attempt to cast doubt on an exhibit's authenticity. Such an issue, however, is to be resolved by the jury, and not the judge. Id.; United States v. Scharon, 187 F.3d 17, 22 (1st Cir. 1999). But at this stage, it is clear with the evidence presented that there is nothing concrete to support the conclusory proposition that Exhibit 50A, the subject videotape, was tampered with by anyone, particularly law enforcement officers. See United States v. Mora, 821 F.2d 860, 869 (1st Cir. 1987).

"As to a chain of custody for the proper admission of a physical exhibit, there must be a showing that the physical exhibit is in substantially the same condition as when the crime was committed." United States v. Kelly, 14 F.3d 1169, 1175 (7th Cir. 1994) (citing United States v. Avilés, 623 F.2d 1192, 1197 (7th Cir.1980)). "When there is no evidence of tampering, a presumption of regularity attends the official acts of public officers in custody of evidence; the courts presume they did their jobs correctly." United States v. Kelly, 14 F.3d at 1175 (citing United States v. Avilés, 623 F.2d at 1198). "All the government must show is that reasonable precautions were taken to preserve the original condition of evidence; an adequate chain of custody can be shown even if all possibilities of tampering are not excluded." Id. "Merely raising the possibility of tampering is not sufficient to render evidence inadmissible[.]" United States v. Kelly, 14 F.3d at 1175 (citing United States v. Harrington, 923 F.2d 1371, 1374 (9th Cir. 1991)). The evidence

CRIMINAL 03-0055 (JAG)                14

presented through the testimony of Héctor Guzmán, Veterans Administration police officer; Detective Marcos Márquez, Veterans Administration Medical Center; Pedro Flores Torrent, retired lieutenant, Veterans Administration Security Police Force; and Lieutenant Antonio Falú Santos, Veterans Administration Police Force, raises not even a veiled hint of the possibility of an alteration of sorts. This, plus the testimony of the Puerto Rico police officers Samuel Morales, José Carrión Colón, Antonio Núñez Fox, and Sergio de Jesús Torres, provides sufficient foundation of authenticity to belie questions of tampering with the original, even with the inconsistency between the testimonies of officer Carrión and officer de Jesús.

In view of the above, I recommend that the motion to suppress or exclude the Veteran's Administration Videotape and Still Photos be DENIED.

Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within ten (10) days of the party's receipt of this report and recommendation. The written objections must specifically identify the portion of the recommendation, or report to which objection is made and the basis for such objections. Failure to comply with this rule precludes further appellate review. See Thomas v. Arn, 474 U.S. 140, 155 (1985; Davet v. Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health & Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

At San Juan, Puerto Rico, this 14th day of February, 2006.

S/ JUSTO ARENAS
Chief United States Magistrate Judge